UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

UNITED STATES OF AMERICA,

Plaintiff,

v.

TONY WILLIAMS,

Defendant.

Case No. 2:14-cr-00334-RFB-VCF

**ORDER GRANTING MOTION TO SUPPRESS**

## I. Introduction

Before this Court for consideration is Defendant Tony Williams' Motion to Suppress, ECF No. 22. The Motion argues that any physical evidence seized from the Defendant or his car in the early morning of September 25, 2014 should be suppressed. The Motion avers that this evidence was seized wrongfully as a result of an unlawful detention and arrest of the Defendant as well as an unlawful search of the car he had been occupying. The Court granted this Motion previously and now elaborates on its decision.

## II. Procedural History

On October 8, 2014, Tony Williams was charged in a one-count Indictment with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g). On November 19, 2014, Williams filed a Motion to Suppress based on unlawful searches regarding the evidence that was seized from him on the day of his arrest on September 25, 2014. On December 8, 2014, the Court held an evidentiary hearing on this Motion and received testimonial and documentary

1   evidence.  On December 10, 2014, the Court announced at a pretrial conference that it was
2   granting the Motion and that a written order would follow.  This order and opinion follows that
3   hearing and explains the Court's basis for suppressing the evidence in this case.

### III. Findings of Fact

The Court makes the following findings of fact based upon the testimony and documents provided at the evidentiary hearing.  These findings of fact are further based upon the Court's assessment of the credibility of the witnesses who testified at the hearing as well as an assessment of the other evidence presented at the hearing.  The Court did not consider any other evidence that may have been attached to motions but was not presented at the hearing.

On September 25, 2014 at around 4:40 a.m., the Las Vegas Metropolitan Police Department ("Metro") received a call from a person identifying himself as Tony Jones.  The caller stated that there was an adult black man sleeping in a grey Ford 500 car.  The car was parked in the parking lot of a residential complex.  The caller said this person in the car was known to sell drugs but did not indicate that this person was selling drugs at the time.  The caller simply wanted the person to be "moved on" from where he was parked and sleeping.

At the time this call came into Metro dispatch, Officers Alvin Hubbard and Thomas Keller were riding together in a marked Metro patrol car.  Hubbard was driving.  Upon reaching the location of the residential complex described by the caller, Hubbard and Keller found a car in the parking lot matching the description provided by the caller.  Hubbard, who was driving, pulled the patrol car up behind the grey Ford, blocking the Ford's ability to leave.   The Ford had cars parked on either side of it and the parking curb was in front it.

In the residential complex, approximately 40 feet away from the Ford was a sign that said "No Loitering" referencing "NRS 207.030".  The Court finds, however, that this sign would not have been visible from the Ford at the time the officers encountered the Ford since it was very dark outside.

After pulling in behind the Ford, the officers turned on their overhead lights and "takedown" lights as well as their spotlights.  They directed their spotlights into the interior of the Ford.  After the officers had turned on their lights, they observed a black man, later identified

as Defendant Tony Williams, appear to sit up inside of the Ford. Williams was sitting in the driver seat. Williams then started the Ford. The officers had already stepped out of their vehicle to approach the Ford. Hubbard was behind the Ford on the driver's side and Keller was behind the Ford on the passenger's side. After starting the car, Williams momentarily placed the car in reverse but then quickly placed the car in park. The car never actually moved despite being placed into reverse momentarily.

While the car was still running, Hubbard approached the Ford and yelled at Williams to turn off the car and exit the vehicle. All of the windows in the Ford were up. Keller had his handgun drawn when he approached the vehicle. Williams complied with Hubbard by turning off the car and exiting the vehicle. Upon exiting the vehicle, Williams closed the driver side door of the Ford. Hubbard approached within two feet of Williams—within arm's reach of him—to initiate a conversation. A few seconds after Hubbard reached this distance, Williams began to run. He ran toward the front of the Ford and then around the other cars that were parked in the lot.

While the testimony of the officers, especially Hubbard, suggested that Williams had left the car running and the car door open, the Court did not find this testimony credible. Additionally, the Court finds that Williams closed the door based upon the officers' description of how Williams fled. That is, the door would have to have been closed in order for Williams to run to the front of the car and away from Hubbard. The Ford was boxed in by parked cars on either side. The Court also finds it highly unlikely that Hubbard, who was standing near the driver door when Williams exited, would have permitted him to completely exit the car without turning it off given that Hubbard's partner was standing behind the car to the right. Finally, the finding regarding the car being turned off is also consistent with the initial report of the events provided by the officers to the detective who memorialized the incident in a report.

When Williams fled, he was immediately pursued by Keller on foot. Williams jumped into the patrol car and began pursuit in the patrol car. The pursuit lasted approximately two minutes. Two or three buildings over (approximately 75 yards) from the building where he had been initially confronted, Williams effectively gave himself up. He tripped and fell and simply

1  did not get up. He lay where he had fallen with his hands out. Keller approached Williams with
2  his gun drawn and pointing at Williams. Hubbard arrived at this location in the patrol car a
3  minute or so later. He observed Williams on the ground prone with his hands out. Keller was
4  standing over him with his weapon drawn.

5  Hubbard approached Williams while the latter was still prone on the ground. Hubbard
6  handcuffed Williams. Hubbard then did a pat down of Williams' backside. He did not feel
7  anything or notice anything. Hubbard then helped Williams get up and brought him around to
8  the front of the patrol vehicle. Hubbard, by his account, then conducted a "search incident to
9  arrest." Hubbard did a pat down of Williams' front and felt nothing. He then reached into and
10 searched all of the pockets of Williams' pants. In the front right pocket, Hubbard found a plastic
11 bag containing crack cocaine. In the left back pocket, Hubbard found $1,165. Hubbard then
12 placed Williams into the back of the patrol car.

13 The Court also does not credit the testimony of Officer Keller that Williams appeared to
14 be reaching into his waistband while fleeing from Keller. This testimony was not credible when
15 presented. Also, it runs counter to the facts of the flight as described by Keller. He indicated
16 that it was dark and that he repeatedly lost sight of Williams as he cleared corners. He also did
17 not adequately explain how he would have seen such a movement pursuing Williams from
18 behind and in the dark. Keller also re-traced the route that Williams had taken when he fled, and
19 he did not find any discarded evidence or contraband.

20 Keller and Hubbard drove back to the original parking lot where the Ford was located.
21 Upon arriving at this location and with Williams handcuffed in the back of the patrol car,
22 Hubbard immediately began to search the Ford. The Ford was not registered to Williams. It was
23 registered to a company named Rodo. The officers never attempted to call this company at all
24 before searching the vehicle. No call was made to Metro dispatch to have the vehicle towed or
25 impounded.

26 Inside of the car, Hubbard found pots and pans and a plastic container with food and
27 utensils inside. In the back seat of the Ford, Hubbard found a purse. He unzipped the purse and
28

1 saw a gun inside of the purse.  He then placed the purse on top of the front hood of his patrol car
2 and called for a detective from the firearms unit.
3 The crack cocaine and the handgun found during the search of Williams' person and his
4 car are the basis for the charges in this case.

**IV. Discussion**

The evidence seized in this case was unlawfully obtained and must therefore be suppressed.  First, Hubbard did not have did not have probable cause to search inside the pockets of Williams' pants.  Second, Hubbard did not have probable cause to arrest Williams and could not therefore conduct a search incident to arrest.  Third, Hubbard did not have probable cause to search the car Williams had been sitting in.

**A.  Police Did Not Have Authority to Search Williams' Pockets**

The police in this case conducted a search of Williams' pockets after placing him into custody.  They did not have probable cause to conduct this search or to arrest Williams.

**1.  Probable Cause Was Necessary to Search Williams' Pockets**

First, as a preliminary matter, the Court finds that Williams' seizure was not complete until he was physically apprehended after he fled. United States v. Smith, 633 F.3d 889, 892–93 (9th Cir. 2011) (finding that defendant who momentarily spoke with police and then fled was not seized until he was physically apprehended).  Williams' seizure was complete at the moment when he surrendered himself to Keller by remaining prone on the ground and spreading his hands out.  See id. ("In this case, where the officer did not use physical force during the initial encounter, the question is whether [defendant's] actions constituted submission to [the officer's] show of authority. . . . Although [defendant] was not seized initially, he was indisputably seized later, after he fled and was apprehended by [the officer].")

Second, the officers needed probable cause to search inside the pockets of Williams' pants.  While this Court finds it unnecessary, at this time, to address the issue of whether or not the officers were authorized to conduct a pat-down search or frisk of Williams after he was seized, the search of his pockets **after** a pat down search which revealed no weapons required probable cause.  Minnesota v. Dickerson, 508 U.S. 366, 375–79 (1993) (finding a search of a

1 defendant's pockets after an initial pat down revealed no weapons was unlawful because it
2 lacked probable cause.)

### 2. Facts Do Not Establish Fair Probability of Finding Contraband

The police did not have probable cause to search Williams' pockets. Probable cause exists if, given the totality of all the circumstances, there is a "fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). The officers did not identify what evidence of a crime or contraband they expected to find based upon their observations of Williams or his conduct. Indeed, the officers' testimony regarding the search of Williams' pockets was void of any reference to facts which, taken in their totality, would justify a search of Williams' pockets. The officers did not have probable cause to search Williams' pockets.

Finally, the Court notes that its reliance on the probable cause standard as a basis for evaluating and ultimately invalidating the search in this case does suggest or imply that the Court has found that the officers had reasonable suspicion to do a pat down search of Williams. The Court simply finds that it need not reach that issue.

### B. No Basis for an Arrest Or A Search Incident to Arrest

The police did not have probable cause to arrest Williams after he ran because they had not observed him commit any crime, and they did not have evidence that he had already committed a crime.

First, the police could not arrest Williams for obstruction simply because he ran from them. Under Nevada law, an individual is guilty of the misdemeanor crime of obstruction if he "willfully hinder[s], delay[s] or obstruct[s] any public officer in the discharge of official powers or duties." Nev. Rev. Stat. 197.190 (2014). This Court finds no authority for the proposition that this statute applies to an individual who simply flees from the police upon being approached by them. Indeed, such a broad interpretation of this statute would undermine the authority in this Circuit which indicates that "headlong" flight from police only creates "reasonable suspicion" to detain that individual. United States v. Smith, 633 F.3d 889, 893–94 (9th Cir. 2011) (noting that simple flight creates "reasonable suspicion"); see also United States v. Navedo, 694 F.3d 463,

1  474 (3d Cir. 2012) ("[U]nprovoked flight, without more, cannot elevate reasonable suspicion to
2  detain and investigate into the probable cause required for an arrest").  This Court will not adopt
3  such an expansive interpretation of this statute.

4  Second, the officers did not observe Williams commit the crime of trespass.  Under
5  Nevada law, an individual commits a criminal trespass if he "willfully goes or remains upon any
6  land or in any building after having been warned by the owner or occupant thereof not to
7  trespass."  Nev. Rev. Stat. §207.200 (2014).  At the time that the police, specifically Hubbard,
8  searched Williams they did not have sufficient facts to support an arrest for trespass.  They did
9  not confirm whether Williams lived in the residential complex where he was parked.  They did
10 not know whether, even if he did not live there, he had permission to be there from another
11 occupant.  They did not know how long he had actually been sleeping in his car.  The caller had
12 not provided any information to suggest that the man in the car had committed a crime.  There
13 was no basis for arresting him for trespassing.

14 Third, the officers had no basis for arresting Williams for the crime of loitering.  In the
15 parking lot where the Ford was parked were "No Loitering" signs referencing "NRS 207.030."
16 Nevada law prohibits a number of practices under the auspices of miscellaneous crimes of
17 vagrancy.  Nev. Rev. Stat. § 207.030(g)(3) makes it unlawful to "[l]odge in any building,
18 structure or place, whether public or private" "[w]ithout the permission of the owner or person
19 entitled to the possession or in control thereof."  The officers did not know whether Williams had
20 permission to be on the lot or not.  Specifically, they did not have any information indicating that
21 he did not have permission to be on the lot.  Moreover, the officers did not have sufficient
22 information to establish that Williams had been "lodging" in the complex itself.  He was in his
23 car and not in a "building" or "structure".  To the extent his car could be defined as a "place"
24 under the statute—a reading the Court does not subscribe to—the officers did not know how
25 long he had been in the lot.  These facts do not provide probable cause to arrest Williams for
26 loitering.
27 / / /
28 / / /

In sum, the police could not search Williams' incident to arrest, since they did not have a basis for arresting him. While Hubbard seemed to justify his search of Williams as a search "incident to arrest," such a search was not authorized.

The search of Williams' pockets was unlawful and the results of this search must be suppressed. Wong Sun v. United States, 371 U.S. 471, 484 (1963).

### C.  Police Did Not Have Probable Cause to Search Williams' Car

The police did not have authority to search Williams' car based upon the totality of circumstances in this case. First, Williams did not abandon his car and render it subject to search without probable cause. Second, the facts do not support an application of the automobile exception or any other exception to the warrant requirement of the Fourth Amendment.

#### 1.  Williams Did Not Abandon His Vehicle

The Court finds that Williams did not abandon his car. The inquiry into abandonment is a "question of intent." United States v. Nordling, 804 F.2d 1466, 1469 (9th Cir. 1986). This inquiry "focus[es] on whether, through words, acts or other objective indications, a person has relinquished a reasonable expectation of privacy in the property at the time of the search or seizure." Id. Williams had not abandoned his vehicle at the time it was searched. Williams fled after he had turned off the vehicle, exited the vehicle and closed the door to the vehicle. He left the vehicle in a residential parking lot where private vehicles could safely be left for extended periods of time. He left his belongings in the vehicle including pots, pans, and food. He never disavowed his possession of the vehicle or the items inside of it. The vehicle was not stolen and had a "paper tag" or license plate suggesting that it had recently been sold to Williams or someone else.[1]

#### 2.  No Facts to Support Search of Vehicle

The police did not have lawful authority to search Williams' vehicle. Under the automobile exception to the Fourth Amendment's warrant requirement, "[t]he police may search

---

[1] The evidence did not clearly establish that Williams was the owner of the vehicle as it was apparently released by Metro to someone else claiming to be the owner of the vehicle. However, no further information was provided to the Court to determine who owned the vehicle at the time of the search. The government never claimed that Williams was not in lawful possession of the vehicle.

- 8 -

1  an automobile and the containers within it where they have probable cause to believe contraband
2  or evidence is contained." California v. Acevedo, 500 U.S. 565, 580 (1991).  For the same
3  reasons noted earlier regarding the lack of probable cause to arrest Williams, the police had no
4  probable cause to search his vehicle.  The police did not identify any contraband or evidence of a
5  crime that they expected to find in this vehicle.  Indeed, by their own account, they arrested
6  Williams for obstructing by running so it is difficult to imagine what evidence they would have
7  identified.

8  Importantly, as the Court has found that the search of Williams' pockets was unlawful,
9  the crack cocaine and money found as a result of this unlawful search cannot be used to justify
10  the subsequent and immediate search of his vehicle.  See United States v. Perea-Ray, 680 F.3d
11  1179, 1184 (9th Cir. 2012) (explaining that "[e]vidence that is derived directly or indirectly from
12  an illegal search cannot 'constitute proof against the victim of the search' quoting Wong Sun v.
13  United States, 371 U.S. 471, 484 (1963)).

14  In conclusion, the search of Williams' vehicle was unlawful.  Any evidence obtained
15  directly or indirectly from this search must be and is suppressed. Id.  This includes the handgun
16  found in the purse in the car.

17  **3. An Inventory Search Cannot Remove Taint of Unlawful Arrest**

18  The search of the Ford was also not lawful as an inventory search.  The police would not
19  have been in a position to conduct a search of the vehicle without consent had they not
20  unlawfully arrested Williams. As noted above, they had no lawful basis for searching the vehicle.
21  Their unlawful arrest of Williams created a situation in which an inventory search became
22  possible.  However, as their unlawful arrest directly created the possibility of impounding and
23  searching the vehicle, any evidence arising from a search made possible by their unlawful
24  conduct must be suppressed as fruit of the poisonous tree.  Wong Sun v. United States, 371 U.S.
25  471, 484 (1963).
26  / / /
27  / / /
28  / / /

Moreover, even if an inventory search was possible[2], the officers did not follow Metro's policy for impounding and then searching a vehicle. The officers did not contact the registered owner of the vehicle to come pick it up as required by Metro policy 5/202.200. They did not call for a tow of the vehicle. In short, their conduct did not reflect an intent to tow the vehicle and they did not follow the policy required for towing vehicles. See United States v. Cervantes, 703 F.3d 1135, 1141 (9th Cir. 2012)(explaining that inventory searches are only lawful when conducted pursuant to department policy and warning that such searches cannot be a "ruse for general rummaging").

**V. Conclusion**

The Court finds that it has given the Government significant opportunity to raise various arguments and issues with the Court to be able to establish the lawfulness of the searches in this case. The Court has considered those arguments and issues. The Court finds the Government has waived any other arguments it may have had but did not actually raise before the Court.

For the reasons stated, the Motion to Suppress is granted. All evidence directly or indirectly obtained from the search of Williams' person as well as the search of the vehicle in which he was found on September 25, 2014 is suppressed.

**DATED** this 4th day of January, 2015.

_____
RICHARD F. BOULWARE, II
UNITED STATES DISTRICT JUDGE

---

[2] It should also be noted that the vehicle was not parked illegally, did not pose any threat to the safety of others and was not in a condition or location that it would necessarily be subject to vandalism. Under such circumstances, it is not apparent that the inventory search exception could be applied. Miranda v. City of Cornelius, 429 F.3d 858, 864 (9th Cir. 2005)(noting that there must be a sufficient basis for impounding the vehicle before an inventory search can be conducted).